UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

TERRY GEARIN, as Conservator of Patricia
M. Gearin; WIPERS RECYCLING, LLC;
and GEARIN, LLC,

Plaintiffs,

v.

CITY OF MAPLEWOOD and DAVID
FISHER, in his individual and official
capacity,

Defendants.

Case No. 08-CV-5019 (PJS/AJB)

ORDER

---

Jill Clark, JILL CLARK, PA, for plaintiffs.

Robin M. Wolpert, John M. Baker, Jenny Gassman-Pines, GREENE ESPEL,
P.L.L.P., for defendants City of Maplewood and David Fisher.

Plaintiffs Patricia Gearin and her two businesses — Wipers Recycling, LLC ("Wipers")

and Gearin, LLC[1] — bring this action under 42 U.S.C. § 1983 against defendants the City of

Maplewood ("the City") and David Fisher, the City's building official.  Plaintiffs allege that the

City and Fisher have retaliated against them for exercising their First Amendment rights and

have attempted to prevent them from exercising their rights to petition the government and to

gain access to the courts.  Plaintiffs further allege that defendants violated their rights to equal

protection and procedural and substantive due process.

---

[1]This lawsuit was originally filed by Patricia Gearin, Wipers, and Gearin, LLC.  After the
lawsuit was filed, Terry Gearin was appointed as Patricia Gearin's conservator.  *See* Docket
No. 147.  In this opinion, the Court will refer both to Gearin individually and (unless the context
indicates otherwise) to Gearin, Wipers, and Gearin, LLC collectively as "Gearin."

This matter is before the Court on defendants' motion for summary judgment. For the reasons stated below, defendants' motion is granted in part and denied in part.

## I. BACKGROUND

### A. Gearin's Prior Disputes with the City

Gearin resides in the City. In 2001, the Ramsey-Washington Watershed District dumped tons of toxic mud and sludge near her home. Clark Decl., July 15, 2010 [Docket No. 178] (hereinafter "Second Clark Decl.") Ex. 11 ¶ 3; Am. Compl. ¶ 7.[2] In her amended complaint, Gearin alleges that the City issued an after-the-fact permit for the dumping and was involved in the cleanup. Am. Compl. ¶ 7. Gearin complained to City officials (including City council members) about the dumping, about the City's issuance of the after-the-fact permit, and about the City's actions during the cleanup. Second Clark Decl. Ex. 11 ¶ 4; Second Clark Decl. Ex. 13 at 7; *see also* Hjelle Dep. 230. Gearin contends that, in response, the City threatened to remove her from her home unless she paid to fix damage to her septic system caused by the dumping. Second Clark Decl. Ex. 11 ¶ 6. Gearin also contends that, after she complained about the dumping, Fisher and the City began identifying repairs that they said needed to be done to bring her home into compliance with the building code. Second Clark Decl. Ex. 11 ¶ 7.

---

[2]In ruling on a summary-judgment motion, the Court would not normally cite allegations in pleadings to supplement the factual record. For present purposes, though, defendants have not disputed Gearin's allegations about the dumping. The Court therefore cites Gearin's amended complaint to provide background information. The Court is not suggesting that any of Gearin's allegations are true.

Gearin is the owner of Wipers and Gearin, LLC. Wipers is in the business of recycling used footwear and clothing. Second Clark Decl. Ex. 25. Reusable items are sold; the remaining items are ground into granules that are used for absorbing toxins and toxic spills. Gearin Decl. ¶ 6, Nov. 24, 2008 [Docket No. 20] (hereinafter "First Gearin Decl."); Gervais Aff., Dec. 15, 2008 [Docket No. 26] Ex. B; Second Clark Decl. Ex. 25.

Wipers operated in the city of St. Paul Park for a number of years. First Gearin Decl. ¶ 3. In July 2007, Gearin purchased a commercial building ("the Building") in the City with the intent of relocating and expanding Wipers. First Gearin Decl. ¶ 6. The Building was previously occupied by Northern Hydraulics (now known as Northern Tool + Equipment), which sold tools and other home-improvement products.[3] Back in 1991, the City had issued a "Certificate of Occupancy" ("COO") to Northern Hydraulics for a B-2 occupancy classification. Clark Decl., Dec. 1, 2008 [Docket No. 21] (hereinafter "First Clark Decl.") Ex. B. At the time that the COO was issued,

> "a 'B-2' occupancy classification applied, in relevant part, to the following businesses:
>
> > 'Drinking and dining establishments having an occupant load of less than 50, wholesale and *retail* stores, office buildings, printing plants, municipal

---

[3]Gearin contends that Northern Hydraulics also operated an engine-repair shop in the Building and makes much of this fact in her brief. But Gearin supports her contention with nothing but plainly inadmissible hearsay. *See* First Gearin Decl. ¶ 3 ("It was my information that that company sold items retail, but also had an engine repair shop"). Gearin's affidavit violates Rule 56(e)(1), which provides that "[a] supporting or opposing affidavit must be made on personal knowledge [and] set out facts that would be admissible in evidence . . . ." The record contains no admissible evidence that Northern Hydraulics operated an engine-repair shop in the Building.

> police and fire stations, *factories and workshops using materials not highly flammable or combustible*, storage and sales rooms for combustible goods, [and] paint stores without bulk handling . . .'"

Second Wolpert Aff. [Docket No. 165] Ex. K at 4 (citation omitted; alterations and emphasis in Ex. K).

Before purchasing the Building, Gearin spoke with several City officials, who informed Gearin that the Building was zoned M1 for "light manufacturing" and that the building code allows any use permitted in the M1 zone as well as the BC ("business commercial") zone. First Gearin Decl. ¶ 5; *see also* First Clark Decl. Ex. L.

To be lawful, then, Gearin's use of the Building had to be within both the B-2 occupancy classification (which applied to the Building) and the M1 zoning classification (which applied to the geographical area in which the Building was located). And, as is true of any owner of any building, Gearin had to comply with the building and fire codes.

### C. The City's Enforcement Actions Against the Building

On July 26, 2007, Gearin was at her newly purchased Building along with Rebecca Cave, a friend of Gearin's who served on the City council. First Gearin Decl. ¶ 8. Fisher, the City's building official, happened to drive by and noticed that the Building was being occupied by a new owner. Second Clark Decl. Ex. 16; Fisher Aff. ¶ 2, Dec. 15, 2008 [Docket No. 25] (hereinafter "First Fisher Aff."). Fisher sent a building inspector to investigate. Second Clark Decl. Ex. 16. The building inspector spoke to Gearin and Cave. Among other things, Gearin told the inspector that she hated the City. Second Clark Decl. Ex. 16.

The next day, Fisher and Butch Gervais (the fire marshal) inspected the Building. Second Clark Decl. Ex. 16; First Fisher Aff. ¶ 2. During the inspection, Gearin told Fisher that she planned to install an industrial grinder in the Building. Fisher I Dep. 116-18;[4] First Fisher Aff. ¶ 3. Gearin's attorney contends in her brief — although neither Gearin nor anyone else asserts in any affidavit — that Gearin did not tell Fisher about the grinder and argues that Fisher has used the grinder as an after-the-fact justification for his actions. (This is one of several occasions on which the parties' attorneys have made factual assertions in their briefs that turn out to be unsupported or contradicted by the factual record.) Fisher clearly testified that Gearin told him about the grinder in July 2007, Fisher I Dep. 116-18, and Gearin offers no testimony or other evidence to the contrary. Indeed, in a state-court complaint filed in 2009, Gearin herself alleged that city officials knew that Gearin had purchased a grinder and came to watch it operate in "fall 2007."[5] Second Wolpert Aff. Ex. G at 7.

After inspecting the Building and speaking with Gearin, Fisher determined that, although Gearin did not need a new COO to run the retail portion of her business, she did need a new COO to run the grinder. First Fisher Aff. ¶ 3; Fisher I Dep. 102. Gearin's attorney disputes that Fisher cared about the grinder and contends that Fisher originally thought that he could require a

_____

[4]Gearin deposed Fisher in August 2009 in a related state-court action and again in July 2010 in this action. The parties have submitted excerpts from both depositions in connection with defendants' summary-judgment motion. The Court will cite the August 2009 deposition as "Fisher I Dep." and the July 2010 deposition as "Fisher II Dep."

[5]Gearin has also argued that, in her initial discussion with Fisher, she merely told him about hypothetical future plans. But, at least according to the administrative law judge who addressed Gearin's later challenge to Fisher's decisions, Gearin ordered the grinder in June 2007, before she moved into the Building. Second Wolpert Aff. Ex. K at 4. If that is true, then Gearin's plans for the grinder were far more than hypothetical when she first spoke to Fisher.

new COO merely because the Building had a new tenant after a period of vacancy. But, again, Gearin's attorney is making a factual assertion that is contradicted by the record. Fisher testified that the City does not have the authority to demand a new COO with each new tenant, Fisher I Dep. 37, 112-14, and he further testified that he based his decision to require a new COO on the fact that there was a change in use from retail to factory, Fisher I Dep. 83; *see also* Fisher I Dep. 117 (agreeing that, without the grinder, there was no requirement to bring the Building into compliance with the building code). Fisher did justify his initial *inspection* on the basis that the Building had a new tenant. Fisher I Dep. 110. But explaining the reason for an inspection is not the same as explaining the reason for requiring a new COO.

Gearin makes much of the fact that Fisher's contemporaneous documents do not mention the grinder. That is literally true, but misleading. The documents clearly reflect Fisher's opinion that the Building's proposed use was a change from retail to factory, *see, e.g.*, First Fisher Aff. Ex. A (review dated August 6, 2007), and it is clear, in context, that the only possible basis for Fisher's conclusion is the installation of the grinder. Nothing in the record or in the parties' briefs even hints at another explanation for Fisher's opinion that Gearin was going to change the use of the building from retail to factory.

Fisher advised Gearin to apply for a new COO. First Gearin Decl. ¶ 10. Gearin did not agree that she needed a new COO, but she submitted an application on July 30. First Clark Decl. Ex. K. On August 1, the City issued an occupancy permit for Wipers. Second Clark Decl. Ex. 1b at 7 [Docket No. 182 at 7]. The permit provided, in relevant part, as follows:

Occupancy for Wipers Recycling LLC

Fire extinguishers must be provided. Accessible counter is required. Maintain exits. Kiosks shall be constructed of non-combustible materials and must be separated from each other by 20 feet.

Temporary permit only. When lease is renewed temporary occupancy permit must also be renewed. *Fire marshal and building official approval required prior to occupancy.*

Second Clark Decl. Ex. 1b at 7 (emphasis added).

A few days later, Fisher (the building official) and Gervais (the fire marshal) again inspected the Building. First Fisher Aff. ¶ 4(a). After the inspection, Fisher and Gervais each sent Gearin a document. Gervais sent Gearin a punch list of items that needed to be completed "in order to continue operating the business." Gervais Aff. Ex. A. Fisher sent Gearin a "certificate of occupancy review" that contained a much longer punch list that needed to be completed to obtain a new COO. First Fisher Aff. Ex. A.

Fisher and Gervais attempted a follow-up inspection on September 27, but Gearin was not ready. First Fisher Aff. ¶ 4(b). Fisher and Gervais granted Gearin a 30-day extension, but then, for reasons that are not clear from the record, Fisher and Gervais went ahead and inspected the Building on October 9. First Fisher Aff. ¶ 4(b), (c). Fisher then sent Gearin another letter. First Fisher Aff. Ex. B. The letter (dated October 11, 2007) does not explicitly state that Gearin had failed to correct the deficiencies noted in Fisher's punch list. Instead, the letter is essentially a summary of Fisher and Gearin's previous interactions. The letter describes Fisher's inspections (although, oddly, does not mention the October 9 inspection); quotes the punch list required by the "certificate of occupancy review"; notes that, on September 27, Gearin asked for more time to complete the corrections; and recounts that Fisher had asked Gearin to provide a

schedule for completing the work and had told Gearin that all "life safety items" needed to be completed immediately.[6]  First Fisher Aff. Ex. B.  The letter goes on to state that, as of October 10, neither Fisher nor Gervais had received a schedule from Gearin.  First Fisher Aff. Ex. B.  The letter then warns Gearin that she has until October 15 — that is, four days from the date of the letter — to complete all the work ordered by the City, failing which the matter would be referred to the city attorney.  First Fisher Aff. Ex. B.  Fisher does not explain how he went from granting a 30-day extension on September 27 to threatening to refer the matter to the city attorney on October 11, and the record is unclear on the matter.

During the next few months, Fisher and Gervais conducted several more inspections. First Fisher Aff. ¶ 4(d), (f), (g).  Each time, Fisher found code violations.  First Fisher Aff. ¶ 4(d), (f), (g).  At some point, Gearin hired an attorney to assist her in dealing with the City.  In November, Fisher met with Gearin's attorney, who proposed a schedule for compliance.  First Fisher Aff. Ex. 4(e) & Ex. C.  After much back-and-forth, Fisher sent a letter dated December 17 in which he ordered Gearin to comply with certain "life safety" requirements by 10:00 a.m. on December 24, 2007.  First Fisher Aff. Ex. D.  The letter states:

> This means the storage must be reduced to five feet for the boots, shoes, and 10 feet for the bundled clothing.  In addition, your areas of storage are limited to 1,000 square feet with twenty-five foot [a]isles between them.  Alternatively, the fire sprinkler system could be updated for high pile storage for boots and shoes.

First Fisher Aff. Ex. D.

---

[6]Gearin claims that Gervais invented the phrase "life safety," and Gervais testified that he came up with the phrase himself.  But the phrase appears in the state building and fire codes. *See, e.g.*, Minn. R. 1300.0110; Minn. R. 7511.0104.

On December 24, Fisher and Gervais met with a representative of Olsen Fire Protection, a contractor retained by Gearin to evaluate the Building's sprinkler system. Second Clark Decl. Ex. 16 at 3. Olsen provided a letter to Gervais in which Olsen opined that Gearin's sprinkler system was sufficient to permit storage up to ten feet. Gervais Aff. Ex. B. Based on this letter, Gervais agreed to permit Gearin to store materials up to a height of ten feet. Gervais Aff. ¶ 3. Gervais asserts, however, that on December 24 Gearin's materials were still stored too high (presumably he means that the height of the stacks exceeded ten feet) and were also blocking some of the aisles in the Building. Gervais Aff. ¶ 2(f).

### D. The January 2008 Fire and Stop-Work Orders

It is not clear from the record exactly when Gearin installed the grinder in the Building, but there is no doubt that it was in the Building by late December 2007. Gearin Decl. ¶ 8, July 15, 2010 [Docket No. 174] (hereinafter "Second Gearin Decl."). In early January 2008, Gearin tested the grinder and was dissatisfied with the size of the granules. Second Gearin Decl. ¶ 8. Gearin also thought that the grinder was running "hot." Second Gearin Decl. ¶ 8. Gearin complained to Vecoplan, which had manufactured the grinder, and Vecoplan sent technicians to investigate the problem. Second Gearin Decl. ¶ 8. On the evening of January 9, the Vecoplan technicians ran the grinder. Gervais Aff. Ex. C at 2. The next morning, Wipers employees arrived at work and found heavy smoke in the Building, apparently caused by material that had been left in the grinder by the Vecoplan technicians and that had caught fire. Gervais Aff. Ex. C at 2. The employees called 911. Firefighters soon arrived and extinguished the fire, which had been confined to the grinder. Gervais Aff. ¶ 4.

Gervais was the first person to arrive at the scene in response to the 911 call, but he did not enter the Building until the fire had been extinguished. Gervais Dep. 98-99. After the fire was extinguished, Gervais advised Gearin that it was dangerous for her employees to be inside the Building and that no employees could work in the Building until the smoke damage had been cleaned up. Gervais Aff. ¶ 5. During the course of the morning, Gervais spoke with two Vecoplan technicians in the parking lot. They told him that they had entered the Building to look at the grinder but had to leave because the smoke and the fumes were too strong. Gervais Dep. 111.

Gervais apparently left the site after speaking with Gearin. He returned in the afternoon, though, because he wanted to ask the Vecoplan technicians whether they had determined the cause of the fire. Gervais Dep. 114, 117. When Gervais arrived, the Vecoplan technicians were working inside the Building. Gervais Dep. 112, 117. At some point that same afternoon, Gervais saw Wipers employees working inside the Building to clean up the smoke damage. Gervais Aff. ¶ 5. After seeing Wipers employees in the Building, Gervais spoke to Fisher, and the two men decided to post a "stop-work" order on the Building. First Fisher Aff. ¶ 5; Gervais Aff. ¶ 6. The stop-work order stated, in relevant part:

STOP WORK

CITY OF MAPLEWOOD
MAPLEWOOD, MINNESOTA
OFFICE OF BUILDING DEPARTMENT

DO NOT REMOVE

THIS BUILDING DOES NOT HAVE
ALL INSPECTIONS AS REQUIRED
BY CITY CODES AND ORDINANCES

-10-

*NO OCCUPANCY WITHOUT*
*CERTIFICATE OF OCCUPAN[CY]*
*— OWNER TO REQUEST CITY*
*AUTHORIZATION TO ENTER*

IS NOT ACCEPTED

[P]lease contact as noted before any [further work is done]
[Call when ready]

First Fisher Aff. Ex. E.[7]

The next day (January 11), Fisher and Gervais learned that the stop-work order had been removed from the Building. First Fisher Aff. ¶ 6. Fisher and Gervais posted another stop-work order. First Fisher Aff. ¶ 6 & Ex. F. The record contains only a photocopy of this order, and the photocopy is of very poor quality. The second stop-work order appears to have a slightly different handwritten message, but still appears to refer to "no occupancy," a certificate of occupancy, and the need to contact someone. First Fisher Aff. Ex. F. In addition to the second stop-work order, Fisher and Gervais posted yet another document, entitled "Notice." The Notice states, in relevant part, as follows:

NOTICE

Wipers Recycling LLC
. . .
Date: January 10, 2008

1.    No operation of any equipment is allowed without a
       Certificate of Occupancy. 12-40 City Code.

---

[7]The portion in italics is handwritten; the remainder is in printed type. The record contains only a photograph of the stop-work order, and that photograph is of such poor quality that it is difficult to read the order. In addition, some portions of the order are obscured by the tape used to post the order. Brackets denote where the Court is unsure of the wording because the type is obscured or almost illegible.

2. All storage limited to 10 FT in Height or less. <u>Per the letter from Olsen Fire Protection, 2002 NFPA 13 12.1.10.1.1 and IFC.</u>

3. All exists [sic] must be maintain[ed] and kept clear of all storage and obstructions. <u>Building and Fire Code — Life Safety.</u>

4. All aisles must be kept clear of obstructions and storage. <u>Building and Fire Code — Life Safety.</u>

5. A Certificate of Occupancy is required by the State Building Code and City of Maplewood Code. <u>(Unsafe Building — 1300.0180 State Building Code), (Certificate of Occupancy State Building Code 1300.0220) & (12-40 City Code).</u>

6. City of Maplewood has an existing Conditional Use Permit on the property that was approved by the City Council December 12, 1994, by resolution. Wipers Recycling LLC is required to be in compliance with all the conditions of the Conditional Use Permit. Notice of this was sent by letter October 2, 2007. <u>City Zoning Code</u>

OK for clean up from fire and inspection from insurance company <u>only</u>. <u>No employees are allowed to work</u> without a certificate of occupancy.

Contact:   David Fisher
           Butch Gervais

First Fisher Aff. Ex. G.

Taken together, Gervais's oral order, the first stop-work order, the second stop-work order, and the Notice are confusing about whether Gearin and her employees were barred from entering the building *at all*.[8] This is a crucial fact in the case, and both plaintiff's counsel and

_____

[8]A later criminal prosecution of Gearin (discussed below) was premised on the notion that the stop-work order absolutely prohibited Gearin from being in the Building. *See State v. Gearin*, No. A09-0467, 2009 WL 3078581, at *1 (Minn. Ct. App. Sept. 29, 2009) (stating that,

(continued...)

this Court have repeatedly pressed defendants to explain what, exactly, the orders and Notice prohibited. Yet defendants have not been able to explain — clearly and consistently — what their orders meant.

At his deposition, Fisher repeatedly evaded the question of whether the stop-work orders prohibited Gearin from entering the Building — a simple question that Fisher should have been able to answer "yes" or "no." *See* Fisher II Dep. 79-83. After Gearin's attorney persisted, Fisher eventually relented and testified that Gearin was "apparently" allowed to enter the Building, because otherwise he would have locked it. Fisher II Dep. 82. But then, just a few questions later, Fisher reversed course and testified that Gearin violated the orders by entering the Building. Fisher II Dep. 83. But then, just a few more questions later, Fisher again reversed course and denied that the stop-work orders prohibited Gearin from entering the Building. Fisher II Dep. 84. Fisher's testimony about the meaning of the stop-work orders is incomprehensible, leaving the Court to wonder how Gearin and her employees were supposed to understand the meaning of the stop-work orders when the City's building official — the guy who *posted* the stop-work orders — cannot explain them.

In addition to Fisher's contradictory testimony, Gervais's actions with respect to the Vecoplan technicians on the day of the fire are also puzzling. Gervais testified that he returned to the Building in the afternoon to find out whether the Vecoplan technicians had determined the cause of the fire, and that the Vecoplan technicians were in the Building when he arrived.

---

[8](...continued)
after the issuance of a cleaning permit, "[n]o persons other than the cleaning contractor were permitted into the building" and stating that Fisher issued a citation "for failing to adhere to the stop-work order").

-13-

Gervais Dep. 112, 114, 117. Although this testimony would suggest that Gervais knew that the Vecoplan technicians were working in the Building — and, in fact, that Gervais wanted them in the Building — Gervais nevertheless denied that he had permitted the technicians to enter (leaving one to wonder how he expected them to have discovered the cause of the fire). Gervais Dep. 114-16. Gervais also conceded, though, that he did not try to prevent the technicians from entering and did not tell them to leave. *See* Gervais Dep. 114, 147-48.

At oral argument, defendants' attorney contended that Gervais told Gearin to keep *everyone* out of the Building — including the Vecoplan technicians — and that it was *Gearin's* responsibility to enforce Gervais's order. Hr'g Tr. 174-75, Sept. 22, 2010 [Docket No. 293] (hereinafter "Tr."). This assertion not only seems odd, but it is contradicted by the record. Gervais testified that it was fine for the Vecoplan technicians to be in the Building even after he posted the stop-work order, and that those technicians were not "red-tagged" out of the Building. Gervais Dep. 126-27, 147-48. He also testified that the grinder "is [the Vecoplan technicians'] piece of equipment and I treat them like the insurance investigators and insurance people. They would have to go in and look at the equipment to see what the cause is." Gervais Dep. 114. According to Gervais, he thought the Vecoplan technicians would know how to protect themselves from the smoke and fumes in the Building. He also admitted, however, that he had no factual basis for his assumption that technicians trained to fix a grinder would know how to protect themselves from smoke and fumes caused by a fire.[9] Gervais Dep. 126, 136.

---

[9]Although not directly relevant to this case, the Court notes that there is evidence that, at some point on the day of the fire, the Vecoplan technicians tried to cover burn patterns on the grinder with paint. Second Clark Decl. Ex. 20 (e-mail from insurance investigator describing Vecoplan technicians' attempt to paint the grinder); Second Clark Decl. Ex. 22 (photograph of
(continued...)

-14-

Assuming that defendants' attorney is correct and that the stop-work orders initially prohibited Gearin from being in the Building altogether — something, as noted, that Fisher both admitted and denied in the course of the same deposition — the record is extremely murky concerning when this prohibition was *lifted*. Gearin (or her insurance company) hired Giertsen Company to clean up the smoke damage. Second Clark Aff. Ex. 23. On January 18, Giertsen obtained a permit to clean the Building. First Fisher Aff. ¶ 8 & Ex. I. There is very little in the record about Giertsen's activities between January and April.[10] On April 25, at Giertsen's request, Fisher inspected the property, determined that it was safe to operate the retail portion of Gearin's business, and issued a COO for an M (or retail) occupancy classification. First Fisher Aff. ¶ 13.

This timeline would suggest that the stop-work orders prohibited Gearin from being in the Building from January 10 until April 25. But defendants have not made such an argument, and the record is confused on this point (as it is confused on so much else[11]). Fire Chief Steven Lukin, who was at the Building on the day of the fire, testified that it was up to the cleanup company to decide when it would be safe for Gearin and her employees to return to the Building.

---

[9](...continued)
grinder showing dripping paint).

[10]Gearin offers a letter from an attorney for her insurer to the Minnesota Department of Commerce in which the attorney sets out a timeline of events. Second Clark Aff. Ex. 23. This letter would appear to be hearsay, but defendants have not objected to it. The letter states that the insurer instructed Giertsen to begin cleaning on January 14 and that the office facilities and the majority of the warehouse were available for business operations by January 15.

[11]The Court recognizes that it sounds like a broken record in repeatedly having to describe the record as confused or murky or incomplete, but the record is, in fact, a mess. Although the parties share responsibility for the state of the record, it is defendants who moved for summary judgment before the completion of discovery and on the basis of a woefully inadequate record.

Lukin Dep. 59-60. Fisher's testimony is, again, confusing: He first testified that he shut the business down for the day. Fisher I Dep. 220, 223, 224-25. Later, he testified that the stop-work orders were revoked when a permit was issued to Giertsen (which was on January 18), and further testified that the permit was "not necessarily" limited to Giertsen employees, Fisher II Dep. 86, 94 — that, in fact, it would be fine for Gearin's employees to help with the cleanup, Fisher I Dep. 231-32. At oral argument, defendants' attorney took yet another position: She argued that the stop-work orders were not revoked until April when Fisher issued the retail (M) COO. Tr. 63. Nevertheless, defendants' attorney did not argue that Gearin was prohibited from working in the Building prior to Fisher's issuance of the COO in April. Instead, she contended that whether Gearin was permitted to be in the Building depended on what Gearin was doing in the Building. Tr. 63-65.

In sum, defendants have utterly failed to explain (1) what, exactly, Gearin was prohibited from doing, and (2) when, exactly, that prohibition was lifted.

### E. The February 2008 Criminal Citations and Search of the Building

The fact that no one — including defendants themselves — can explain the meaning of their orders did not prevent defendants from pursuing a criminal prosecution against Gearin for violating those orders.

According to Fisher, at some point in January or February (or both) he repeatedly saw a "large number" of cars in the Building's parking lot. First Fisher Aff. ¶ 9. As a result, Fisher became concerned that Gearin's employees were working in the Building under hazardous conditions. First Fisher Aff. ¶ 9. On February 12, Fisher and Gervais attempted to inspect the Building, but Gearin refused to let them enter the Building. First Fisher Aff. ¶ 9. Gervais then

issued a citation to Gearin on Fisher's behalf. First Gearin Decl. Ex. III. The citation lists two alleged offenses: "certificate of occupancy" under City Ordinance 12-40 and "State code certificate occupancy" under Minn. R. 1300.0220. (Both City Ordinance 12-40 and Minn. R. 1300.0220 concern when a COO is required before a building may be used or occupied.)

Under the heading "probable cause statement," the citation states: "Citation was issue on behave [sic] of the building official David Fisher. Occupying without city approval after notice not to occupy was issued." First Gearin Decl. Ex. III. According to Gervais, he lacks authority to issue citations for building-code violations, but he issued the citation on Fisher's behalf because Fisher forgot to bring his citation book. Gervais Dep. 164. Although the citation lists two "certificate of occupancy" violations, Gervais testified that the citation "had nothing to do with the certificate of occupancy." Gervais Dep. 165. Instead, Gervais said, the citation was issued because "the property was being occupied without city approval." *Id.*

Fisher again tried to inspect the Building on February 13, and Gearin again denied him access. First Fisher Aff. ¶ 10. On February 15, Fisher applied to the Ramsey County District Court for an "administrative warrant." First Fisher Aff. ¶ 11 & Ex. J. In his supporting affidavit, Fisher asserted that, on February 12, he saw seven vehicles in the Building's parking lot, none of which had signage consistent with the contractors working pursuant to the cleaning permit. First Fisher Aff. Ex. J ¶ 17. Fisher further asserted that, on February 13, he saw eight vehicles in the parking lot. First Fisher Aff. Ex. J ¶ 18.

The Ramsey County District Court issued an "Administrative Search Warrant" on February 15. First Fisher Aff. Ex. J at 1. Fisher, along with several City police officers, went to the Building to execute the warrant. First Fisher Aff. ¶ 12. Although the warrant permitted entry

-17-

without knocking, First Fisher Aff. Ex. J at 1, Fisher called Gearin and advised her that he was

outside the Building and had a warrant, First Gearin Decl. ¶ 39.  The police officers broke a

window to get into the Building.  First Fisher Aff. ¶ 12.  What happened during the search is

hotly disputed between the parties, but, for purposes of defendants' motion, the actual facts are

largely irrelevant.[12]  What is relevant is that, after the search, the police issued another citation to

Gearin, accusing her of another certificate-of-occupancy offense and of obstructing legal

process.  Docket No. 279 at 2.[13]

### F.  The Criminal Action Against Gearin

The two February citations were the beginning of a criminal prosecution of Gearin, the

precise procedural history of which is, like so much in this case, murky.  Because the Court

could not discern the procedural history from the record submitted by the parties, the Court

asked the parties to file a timeline of events.  That timeline identifies four criminal complaints:

one dated October 30, 2008, one dated November 5, 2008, and two dated December 9, 2008.[14]

*See* Docket No. 279.  The record also indicates that an amended complaint was filed on

---

[12]The City's actions in connection with the search are the subject of another lawsuit currently pending before this Court.  *See Gearin ex rel. Gearin v. Rabbett*, No. 10-2227 (PJS/AJB) (filed June 3, 2010) (*Gearin II*).

[13]The parties assert that the February 15 citation is not part of the record in this case.  But a citation numbered 908-121791 — which the parties agree is the number of the February 15 citation — may be found in the record in this case at Docket No. 178-5 at 38.  The parties dispute the narrative portion of the citation (which, incidentally, is *not* part of the citation in the record in this case, but only part of the citation in the record in *Gearin II*), but that dispute is irrelevant for purposes of defendants' motion.

[14]The October complaint was filed in this case in connection with an earlier motion for a protective order.  *See* Docket No. 67-1 at 1-4.  The November complaint is not in the record in this case and Gearin objects to any belated attempt to make it part of the record.  The parties submitted the two December 9 complaints with their timeline.  *See* Docket No. 279 Exs. B, C.

December 18, 2008.  Second Wolpert Aff. Ex. F at 11; *see also State v. Gearin*, No. A09-0467, 2009 WL 3078581, at *2 (Minn. Ct. App. Sept. 29, 2009).

According to the parties, there is no indication that the October complaint or the two December 9 complaints were ever filed with the state criminal court.  Docket No. 279 at 3.  Thus, although the parties do not say so explicitly, it appears that the November complaint was, for at least a time, the operative criminal complaint.  The November complaint is not in the record.  But there is no dispute that the November complaint charged Gearin with one count of obstructing legal process and two counts of misdemeanor "certificate of occupancy" violations.  Docket No. 279 at 4; Second Clark Decl. Ex. 9 at 40 [Docket No. 202 at 5]; *Gearin*, 2009 WL 3078581, at *2.

At a December 10, 2008 hearing, a state-court judge dismissed the two misdemeanor "certificate of occupancy" charges in the November complaint on a technicality — specifically, because the prosecutor had failed to provide certified copies of the relevant City ordinance.  Second Clark Decl. Ex. 9 at 40-41.  Shortly afterwards, on December 18, the prosecutor filed an amended complaint charging Gearin with one count of obstructing legal process, two counts of fifth-degree assault, and one count of disorderly conduct.[15]  Second Wolpert Aff. Ex. F at 10-11; *see also Gearin*, 2009 WL 3078581, at *2.  Apparently, the prosecutor had lost interest in pursuing the "certificate of occupancy" offenses, as they were not included in the amended complaint.

In March 2009, the state-court judge found that there was no probable cause for the February 15 "Administrative Search Warrant" because, in the affidavit supporting the warrant,

---

[15]It does not appear that the December 18, 2008 amended complaint is in the record.

Fisher falsely asserted that no COO had ever been in place for the Building.  Second Wolpert Aff. Ex. F at 6-9.  As a result, the judge suppressed evidence of building-code violations allegedly found during the search.  Second Wolpert Aff. Ex. F at 9.  The judge also dismissed three of the four charges in the amended complaint (including obstructing legal process, disorderly conduct, and one of the two assault charges) for pleading defects unrelated to the suppression order or the propriety of the February 15 search.  Second Wolpert Aff. Ex. F at 11-13.

The State appealed the suppression order and the dismissal of the obstructing-legal-process and assault charges.  The Minnesota Court of Appeals declined to review the suppression order, holding that, because the order would not have a "critical impact" on the State's ability to prosecute the charges in the amended complaint, the court would not address the merits of the State's appeal of the suppression order.[16]  *Gearin*, 2009 WL 3078581, at *4.  But the court did reinstate the obstructing-legal-process and assault charges.  *Gearin*, 2009 WL 3078581, at *6.  (The State did not appeal the dismissal of the disorderly-conduct charge.  *Id.* at *3 n.1.)  On October 12, 2009, shortly after the Minnesota Court of Appeals issued its decision, the City prosecutor voluntarily dismissed the entire case.  Second Wolpert Aff. Ex. M.

### G.  Gearin's Challenges to the COO Determination

In February 2009, Gearin filed an action in state court against Fisher, the City, and others.  Second Wolpert Aff. Ex. G.  Among other things, Gearin sought a declaratory judgment that she did not need a new COO to operate the grinder, and Gearin sought a writ of mandamus

---

[16]To prevail on an appeal of a pretrial criminal order under Minnesota law, the State must "show that the order is erroneous and will critically impact the state's ability to prosecute the case."  *Gearin*, 2009 WL 3078581, at *3.

directing Fisher to comply with the procedural requirements of Chapter 326B of the Minnesota Statutes.  Second Wolpert Aff. Ex. G at 18-19.  At a summary-judgment hearing sometime in the fall of 2009, Gearin voluntarily dismissed her mandamus and declaratory-judgment claims. Second Wolpert Aff. ¶ 10.

In September 2009, Gearin filed an application with the State Appeals Board of the Minnesota Department of Labor and Industry ("DOLI"), seeking to overturn Fisher's decision that she needs a new COO to operate the grinder.  Second Wolpert Aff. Ex. I.  The State Appeals Board voted against Gearin's appeal and agreed with Fisher that Gearin needed a new COO for the grinder.  Second Wolpert Aff. Ex. J.  Gearin appealed the State Appeals Board's decision to the Office of Administrative Hearings ("OAH"), which affirmed the decision in May 2010. Second Wolpert Aff. Ex. K.  The OAH administrative law judge ("ALJ") agreed with Gearin that, under the 1991 B-2 COO, *some* factory use was permitted.  But the ALJ explained that the B-2 COO did not permit *all* factory use.  In particular, it did not permit factories using highly flammable or combustible material.  Because Gearin's proposed use of the grinder would create combustible dust, the ALJ explained, her proposed use did not fit within the existing COO, and she needed to obtain a new COO before she could operate the grinder.  Second Wolpert Aff. Ex. K at 11.

Gearin filed a petition with the Minnesota Court of Appeals for review of the ALJ's decision in June 2010.  Second Wolpert Aff. Ex. N.  Although the status of that review is not in the record, the public filings in that case indicate that Gearin withdrew her petition on October 1, 2010.  *See In re the Decision of the State Board of Appeals dated Sept. 30, 2009*, No. A10-1083 (Minn. Ct. App. filed June 22, 2010); *see also Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th

Cir. 2005) ("we may take judicial notice of judicial opinions and public records"). Thus, the State's ruling is final: The City has acted properly in preventing Gearin from running her grinder until she obtains a new COO.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255.

### B. First Amendment Retaliation

To prevail on a First Amendment retaliation claim, a plaintiff must show protected activity, adverse action, and causation — specifically: (1) that she engaged in activity protected by the First Amendment; (2) that the defendant took action against her that was sufficiently serious to chill a person of ordinary firmness from engaging in protected activity; and (3) that the defendant took the adverse action in retaliation for the protected activity. *See Zutz v. Nelson*, 601 F.3d 842, 848-49 (8th Cir. 2010). The defendant's retaliatory motive must be a but-for cause of the retaliation; a plaintiff cannot recover if the defendant would have taken the same adverse action even in the absence of the improper motive. *Osborne v. Grussing*, 477 F.3d 1002, 1006 (8th Cir. 2007).

Gearin claims that Fisher's and the City's treatment of her and her business was in retaliation for her exercise of her First Amendment rights — in particular, her criticisms of the City's actions with respect to the toxic dump near her home, her association with a particular City council member (Rebecca Cave), and her statement that she "hates Maplewood." At oral argument, Gearin agreed that the relevant adverse actions are the following: (1) Fisher's determination that she needs a new COO to operate the grinder; (2) the stop-work orders that Fisher posted after the January 2008 fire; (3) the February 12 citation; and (4) the February 15 citation.

Defendants do not dispute that Gearin engaged in protected activity. Nor, at least for purposes of their summary-judgment motion, do defendants dispute that they took adverse action against Gearin that would chill a person of ordinary firmness from engaging in protected activity. Instead, defendants move for summary judgment on Gearin's First Amendment retaliation claim on one ground and one ground only: because, defendants say, Gearin cannot prove that the City lacked probable cause for the adverse actions. Unless Gearin can prove an absence of probable cause, defendants argue, Gearin cannot prevail on her First Amendment retaliation claim.

Defendants are only partially correct in characterizing the law. Gearin has alleged two types of retaliatory actions. First, she has alleged that defendants retaliated against her by initiating *criminal prosecutions* (the February 12 citation and the February 15 citation). Second, she has alleged that defendants retaliated against her by initiating *regulatory actions* (the order that she obtain a new COO and the stop-work orders). This distinction is critical because, as a close reading of recent Supreme Court and Eighth Circuit decisions will demonstrate, a plaintiff

needs to prove an absence of probable cause only when she is complaining of retaliatory

criminal prosecutions, and not when she is complaining of retaliatory regulatory actions.

The relevant case law begins with the recent decision of the United States Supreme Court

in *Hartman v. Moore*, 547 U.S. 250 (2006).  In *Hartman*, the Supreme Court held that, to prevail

on a First Amendment claim of retaliatory criminal prosecution, a plaintiff must prove lack of

probable cause for the underlying criminal charge.  *Id.* at 252.  The Court based its decision on

"the need to prove a chain of causation from animus to injury, with details specific to

retaliatory-prosecution cases . . . ."  *Id.* at 259.

Ordinarily, the Court explained, no specific type of evidence is necessary to prove a

connection between the activity protected by the First Amendment and the adverse action

allegedly taken in retaliation for that protected activity.  Instead, the type of proof "will depend

on the circumstances."  *Id.* at 260.  But, the Court reasoned, retaliatory-prosecution cases are

different:

> What is different about a prosecution case . . . is that there will
> always be a distinct body of highly valuable circumstantial
> evidence available and apt to prove or disprove retaliatory
> causation, namely evidence showing whether there was or was not
> probable cause to bring the criminal charge.  Demonstrating that
> there was no probable cause for the underlying criminal charge
> will tend to reinforce the retaliation evidence and show that
> retaliation was the but-for basis for instigating the prosecution,
> while establishing the existence of probable cause will suggest that
> prosecution would have occurred even without a retaliatory
> motive.

*Id.* at 261.  Thus, said the Court, even if plaintiffs were not *required* to prove a lack of probable

cause for prosecutions, "litigating probable cause [would] be highly likely in any

retaliatory-prosecution case, owing to its powerful evidentiary significance." *Id.* at 261 (footnote omitted).

Retaliatory-prosecution cases are different in a second respect, the Court said. "[T]he difference is that the requisite causation between the defendant's retaliatory animus and the plaintiff's injury is usually more complex than it is in other retaliation cases . . . ." *Id.* In a typical retaliation case, the government official who had the retaliatory animus and the government official who took the adverse action are one and the same. But in a retaliatory-prosecution case, the defendant is not the prosecutor who initiated the allegedly retaliatory prosecution, because the prosecutor enjoys absolute immunity. "Instead, the defendant will be a nonprosecutor, an official . . . who may have influenced the prosecutorial decision but did not himself make it . . . ." *Id.* at 262. According to the Court, "the need to show this more complex connection" — that is, the connection between the animus of the defendant (who did not prosecute the plaintiff) and the prosecution of the plaintiff — "supports a requirement that no probable cause be alleged and proven." *Id.* at 261. The Court concluded:

> Some sort of allegation, then, is needed . . . to bridge the gap
> between the nonprosecuting government agent's motive and the
> prosecutor's action . . . . And at the trial stage, some evidence must
> link the allegedly retaliatory official to a prosecutor whose action
> has injured the plaintiff. The connection, to be alleged and shown,
> is the absence of probable cause.

*Id.* at 263.

The Court recognized that its holding could, at least in theory, shield some unlawful retaliation from judicial review. *Id.* at 265. But the Court made what was essentially a policy choice that, to bridge the gap between the defendant who allegedly harbored the retaliatory

animus and the prosecutor who actually decided to bring the charge, the plaintiff must prove lack of probable cause. *Id.* at 263.

Courts have struggled to decide how far to extend the reasoning of *Hartman*. Three recent cases from the Eighth Circuit — *Williams v. City of Carl Junction*, 480 F.3d 871 (8th Cir. 2007), *Osborne v. Grussing*, 477 F.3d 1002 (8th Cir. 2007), and *Cross v. Mokwa*, 547 F.3d 890 (8th Cir. 2008) — are highly instructive and control the outcome of this case.

In *Williams*, the plaintiff was cited dozens of times for violating municipal ordinances. 480 F.3d at 877. There was, however, no intervening action by a prosecutor, which distinguished *Williams* from *Hartman*. The Eighth Circuit nevertheless applied *Hartman* and held that the plaintiff had to prove lack of probable cause for the citations in order to prevail on his First Amendment retaliation claim. *Id.* at 876. The Eighth Circuit reasoned that, under the facts of the case, there was a similar break in the chain of causation because the government official who allegedly harbored the retaliatory animus (the town's mayor) did not himself issue the citations. *Id.*

The *Williams* court hinted that it might apply *Hartman* even more broadly by favorably citing the decision of the Sixth Circuit in *Barnes v. Wright*, 449 F.3d 709 (6th Cir. 2006). *See Williams*, 480 F.3d at 876. In *Barnes*, the plaintiff sued police officers who both harbored allegedly retaliatory animus toward the plaintiff *and* initiated allegedly retaliatory grand-jury proceedings against the plaintiff. *Barnes*, 449 F.3d at 720. Applying *Hartman*, the Sixth Circuit held that the plaintiff had to prove a lack of probable cause. *Barnes* acknowledged that "[t]he concerns regarding the intervening actions of a prosecutor do not apply in this case, because the officers themselves initiated the grand jury proceedings against Barnes." *Id.* Nevertheless,

*Barnes* found that the *Hartman* rule "sweeps broadly" and should be generally applied in retaliatory-prosecution cases.  *See id.*

By relying on *Barnes*, then, *Williams* implied that the Eighth Circuit might likewise apply *Hartman* to all retaliatory-prosecution cases, whether or not the official initiating the prosecution was the same as the official harboring the retaliatory animus.  And this would be consistent with pre-*Hartman* Eighth Circuit case law, which held that probable cause for an allegedly retaliatory arrest defeats a claim of First Amendment retaliation.  *Smithson v. Aldrich*, 235 F.3d 1058, 1063 (8th Cir. 2000) (pre-*Hartman* case holding that probable cause for arrest defeated plaintiff's claim of retaliatory arrest brought against arresting officers); *see also Cross*, 547 F.3d at 896-97 (because there was probable cause to enforce the housing ordinance, the plaintiffs could not succeed on a First Amendment "selective enforcement" claim against arresting officers).

The second highly relevant Eighth Circuit case is *Osborne v. Grussing*, 477 F.3d 1002 (8th Cir. 2007).  In *Osborne*, the plaintiffs had publicly criticized county officials for failing to enforce environmental and zoning regulations against two developers.  *Id.* at 1004.  The developers, in turn, had complained that the plaintiffs had also violated environmental regulations and county ordinances when they made improvements to their own properties.  *Id.* The officials eventually approved the plaintiffs' applications for after-the-fact permits, but made the approval subject to numerous onerous conditions.  *Id.* at 1004-05.  The plaintiffs sued, alleging that the onerous conditions were imposed in retaliation for their earlier criticisms of the officials.  *Id.* at 1005.

There was no dispute that the plaintiffs had violated the relevant regulations. *Id.* at 1006 ("We deal here with retaliation claims by citizens seeking to avoid the consequences of their illegal actions."). And, other than alleging that the officials had unconstitutional motives, the plaintiffs did not otherwise argue that the officials' actions were invalid or that the conditions for the after-the-fact permits were beyond the officials' power to impose. Plainly, then, the officials did have "probable cause" to impose the conditions on the plaintiffs. If the existence of probable cause were enough to defeat the plaintiffs' retaliation claims, the Eighth Circuit could simply have applied *Hartman* and affirmed the dismissal of the plaintiffs' claims.

But that is not what the Eighth Circuit did. Instead, the Eighth Circuit held that a plaintiff subjected to adverse *regulatory* action for allegedly retaliatory reasons must show *not* that the regulators lacked probable cause, but that other, similarly situated individuals were not subjected to such action:

> Recognizing that we must craft a causation standard "with details specific to" this type of case, *Hartman*, 126 S. Ct. at 1703, we conclude that a plaintiff who seeks relief from valid adverse regulatory action on the ground that it was unconstitutional retaliation for First Amendment-protected speech must make the same showing that is required to establish a claim of selective prosecution — "that he has been singled out for prosecution while others similarly situated have not been prosecuted for conduct similar to that for which he was prosecuted [and] that the government's discriminatory selection of him for prosecution was based upon . . . his exercise of his first amendment right to free speech." *United States v. Catlett*, 584 F.2d 864, 866 (8th Cir. 1978), citing *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974).

*Id.* at 1006.[17]  Thus, under *Osborne*, a plaintiff can recover for valid adverse regulatory action only if she can prove that (1) she was singled out for the regulatory action while others similarly situated have not been so treated and (2) the government's discriminatory selection was based on her exercise of First Amendment rights.  Under *Osborne*, then, it would appear that Gearin does not need to prove a lack of probable cause for the regulatory actions about which she complains (Fisher's decisions to require a new COO and to post the stop-work orders).

The law of the Eighth Circuit would be crystal clear but for a third recent Eighth Circuit case — *Cross v. Mokwa*, 547 F.3d 890 (8th Cir. 2008) — that, at first glance, seems inconsistent with *Osborne*.  In *Cross*, a city adopted a "Building Code Violation Enforcement Plan" to prevent unlawful occupation of condemned buildings by protesters at a World Agricultural Forum conference.  *Id.* at 893.  The plaintiffs were out-of-town protesters who were temporarily (and illegally) occupying a condemned building.  *Id.*  The plaintiffs were arrested and charged with illegal occupation.  *Id.*  After entering *Alford* pleas to the charges, the plaintiffs brought various constitutional claims, including a claim that the arresting officers violated their First Amendment right to protest.  *Id.* at 893, 896.  In rejecting the First Amendment claim, *Cross* observed that "because there was *probable cause* to enforce the housing ordinance, the plaintiffs could not succeed on a claim of 'selective enforcement' under the First Amendment with respect to proper code enforcement actions."  *Id.* at 896-97 (emphasis added).

---

[17]*Osborne*'s reference to "a claim of selective prosecution" might seem to invoke *Hartman*.  But the cases cited in *Osborne* are criminal cases discussing claims of selective prosecution in the criminal context.  *Catlett*, 584 F.2d at 865-66; *Berrios*, 501 F.2d at 1211.  In the criminal context, the existence of probable cause does not automatically defeat a claim of selective prosecution, although the defendant's burden of establishing selective prosecution is a "demanding" one.  *See United States v. Armstrong*, 517 U.S. 456, 463, 464-66 (1996).

Although this sweeping statement would seem to require a plaintiff to prove a lack of probable cause in retaliatory "code enforcement actions" — and although "code enforcement actions" would seem to be regulatory, not criminal — a careful reading of *Cross* demonstrates that the "code enforcement actions" to which the Eighth Circuit referred were the arrests and prosecutions of the plaintiffs for illegally occupying a condemned building. *Id.* at 893, 896 (describing arrests and prosecution and stating that the plaintiffs' First Amendment claims challenge "the police officers' actions at" the building). Thus, *Cross's* reference to "code enforcement actions" under the "housing ordinance" is almost surely meant to refer, not to the type of civil regulatory actions at issue in *Osborne*, but to the type of criminal citations at issue in *Williams*.

This reading of *Cross* is in line with *Williams* and earlier circuit precedent holding that probable cause defeats a retaliatory-arrest claim. It also makes sense in light of the fact that both *Osborne* and *Cross* were authored by the same judge, yet *Cross* did not even cite *Osborne*. Instead, *Cross* cited *Williams* as well as several other cases concerning arrests and criminal prosecutions. *Id.* at 896-97 (citing *Barnes*, 449 F.3d at 720 (rejecting retaliation claim arising out of arrest and indictment because officers had probable cause to believe the defendant committed a crime); *Smithson*, 235 F.3d at 1063 (rejecting retaliation claim arising out of arrest and charge because officers had probable cause to believe that the plaintiff was violating a sound ordinance); and *Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1079-81 (8th Cir. 1990) (holding that the defendant officer's subjective reasons for arresting the plaintiff were irrelevant to the plaintiff's Fourth Amendment claim of unlawful arrest)). There is thus no reason to believe that *Cross* rejected or modified *Osborne*.

In sum, then, under *Hartman*, *Williams*, *Osborne*, and *Cross*, Gearin must prove, as an element of her case, a lack of probable cause for the two February criminal citations. But Gearin need not prove, as an element of her case, that Fisher's regulatory decisions to require a new COO and to post the stop-work orders were unsupported by probable cause. Because the only argument that defendants have made in moving for summary judgment on the First Amendment retaliation claim is that Gearin has not proven a lack of probable cause, and because Gearin need not prove a lack of probable cause with respect to Fisher's decisions to require a COO and to post the stop-work orders, the Court denies defendants' motion insofar as it applies to those regulatory decisions.

The Court also denies defendants' motion insofar as it applies to the two criminal citations issued in February 2008. To begin with, defendants did not brief the question of whether there was probable cause for the citations. *See* Docket No. 163 at 14 (list of actions for which defendants contend there was probable cause; the list does not include the citations). Setting that aside, the Court cannot find, on this record, that there was probable cause for the citations. Despite pursuing an 18-month-long criminal prosecution of Gearin that spawned at least five criminal complaints — and despite litigating this case for nearly two years and moving for summary judgment — defendants are utterly incapable of offering a coherent explanation of *why* Gearin was cited. How could this Court possibly find that there was probable cause for defendants to issue the February citations to Gearin when defendants cannot explain *why* they issued the February citations to Gearin?[18]

---

[18]The Court recognizes that it is Gearin's burden to prove lack of probable cause. But in order to meet this burden, Gearin would have to be told why she was criminally cited. Gearin

(continued...)

The citations themselves, and the criminal complaints that arose out of them, all suggest that Gearin was cited simply for being in the Building. *See* Kryzer Aff. Ex. A [Docket No. 67] (unsigned October criminal complaint arising out of both February citations); Docket No. 279 Exs. B, C (unsigned December 9 criminal complaints arising out of February 12 and February 15 citations, respectively). But as discussed earlier, the record is hopelessly confused concerning whether the stop-work orders prohibited Gearin from being in the Building and, if so, when that prohibition was lifted. A reasonable jury could easily find that, as of February 12 (when she was first cited), Gearin was not prohibited from being in the Building.

Indeed, at oral argument defendants' attorney abandoned the argument that Gearin was prohibited from being in the Building on February 12 or February 15. Instead, defendants' attorney contended that whether Gearin was violating the stop-work orders on those dates depended on what Gearin was doing in the Building. Tr. 63-65. After much prodding by the Court, however, defendant's attorney eventually conceded that there is no evidence about what Gearin was doing in the Building on February 12. Tr. 65. That alone defeats defendants' argument that there was probable cause for the February 12 citation.

As for the February 15 citation, defendants have offered evidence that, on February 15, there were blocked exits and obstructed aisles in the Building. First Fisher Aff. ¶ 12. But there is no evidence that the February 15 citation or the criminal complaints based on it had anything to do with blocked exits or obstructed aisles. To the contrary, the criminal complaints are

---

[18](...continued)
has spent three years trying without success to get defendants to explain why she was cited. Government officials should not be able to benefit from their own failure to meet the basic constitutional requirement that an accused be informed of the "nature and cause of the accusation" against her. U.S. Const. Amend. VI.

premised on the allegation that Gearin and her employees were completely prohibited from entering the Building. True, the criminal complaints also allege that employees were sorting shoes in the Building. *See* Docket No. 279 Ex. C. But there is no evidence that anyone was operating the grinder, which was, so far as the Court can tell from the record, the only type of activity that was indisputably prohibited.

In sum, the Court cannot possibly hold that, as a matter of law, defendants had probable cause for the citations issued to Gearin. Defendants' motion for summary judgment on Gearin's First Amendment retaliation claim is therefore denied.

## C. Access to Courts

The Constitution guarantees a right of access to the courts. *See Scheeler v. City of St. Cloud*, 402 F.3d 826, 830 (8th Cir. 2005) ("The right of access to the courts is well-established."). Although the existence of this right is clear, "the constitutional basis for the right is 'unsettled.'" *Id.* (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)). The Eighth Circuit has said that the right derives both from the First Amendment and from the Due Process Clause. *Id.* at 830-31. To successfully pursue a First Amendment claim, a plaintiff must show that the defendant acted with some intentional motivation to restrict her access to the courts. *Id.* at 830. To successfully pursue a due-process claim, a plaintiff must show that the defendant acted with deliberate indifference to her right to access the courts. *Id.* at 831.

Gearin claims that various actions by defendants have violated her right of access to the courts.[19] As best as the Court can tell from the amended complaint and from Gearin's briefing,

---

[19]Gearin is presumably arguing that defendants unsuccessfully *attempted* to restrict her access to the courts. If there is one thing that Gearin has demonstrated — as she has filed

(continued...)

Gearin's access claim has three aspects:  First, Gearin claims that, by refusing to issue a formal order or notice from which Gearin could take an appeal, Fisher violated her right to challenge his decisions in court.  Second, Gearin claims that defendants have engaged in misconduct in this litigation for the purpose of manipulating the results of this lawsuit.  Finally, Gearin claims that defendants' adverse regulatory actions against her were a preemptive strike intended to drain her of resources and discourage her from suing the City for its alleged involvement in the toxic dump behind her home.  To distinguish between these three aspects of Gearin's access claim, the Court will refer to them as the "appeal-access claim," the "*Gearin I* access claim," and the "toxic-tort access claim."

### 1.  The Appeal-Access Claim

Gearin claims that Fisher violated the procedural requirements of Minn. Stat. § 326B.082, thus hampering her ability to challenge his decisions in court.  According to Gearin, § 326B.082 required Fisher to give her formal notice of his decisions, inform her of her right to appeal his decisions, and provide her a hearing within ten days after posting the stop-work orders.

Even accepting the dubious proposition that a violation of a state procedural rule is, without more, a violation of the First Amendment right of access to courts, Gearin's claim nevertheless fails because Fisher did not violate any state procedural rule.  Section 326B.082, by its terms, applies to the Commissioner of DOLI and his duly designated representatives.  *See* Minn. Stat. § 326B.01, subd. 3 (defining "commissioner," for purposes of Chapter 326B, as "the

---

[19](...continued)
lawsuit after lawsuit after lawsuit — it is that she has ample access to the courts.

commissioner of labor and industry or a duly designated representative of the commissioner who is either an employee of the Department of Labor and Industry or a person working under contract with the department"). Fisher is the building official for the City. He is not the Commissioner of DOLI, and there is no evidence that he is a duly designated representative of the Commissioner — or, for that matter, that he works for DOLI or is under contract to DOLI. Fisher's actions were thus not governed by § 326B.082.

Furthermore, Fisher's alleged refusal to issue a formal order or notice did not in fact prevent Gearin from challenging his decisions in court. To the contrary, Gearin has had a full opportunity to challenge Fisher's decisions, and she has thoroughly availed herself of that opportunity. Gearin first challenged Fisher's actions in a February 2009 declaratory-judgment and mandamus action filed in state court. After voluntarily dismissing that action, Gearin appealed Fisher's decisions to the State Appeals Board in September 2009. After the State Appeals Board rejected her appeal, Gearin appealed to the OAH, which affirmed the Appeals Board's decision in May 2010. Gearin then sought review by the Minnesota Court of Appeals before voluntarily dismissing her petition.

For all that appears from the record, Gearin did not move more quickly to seek review of Fisher's decisions because she was unaware of the proper procedure. Gearin appears to believe that it was Fisher's responsibility to educate her or her attorney about the appeals process, but Gearin cites no law imposing such a requirement. Moreover, the record demonstrates that Fisher did, in fact, notify Gearin of her right to appeal to the State Appeals Board in December 2008, many months before she finally filed an appeal. Docket No. 178-8 at 76 (December 2008 letter

from Fisher to Gearin's counsel inviting her to fill out a request for review). Fisher can hardly be blamed for the delays that occurred after December 2008.

In short, nothing that Fisher did or failed to do deprived Gearin of her right to access the courts to challenge his decisions. The Court therefore grants summary judgment to defendants on Gearin's appeal-access claim.

## 2. The *Gearin I* Access Claim

Much of Gearin's brief focuses on a newly minted claim that defendants have engaged in misconduct to make it more difficult for Gearin to pursue this lawsuit.[20] Gearin raises a host of factual allegations in support of this heretofore unknown claim. In particular, Gearin claims that defendants tricked their way into the Building in an October 2008 mediation session in order to obtain information to use against Gearin in this case.[21] Gearin also claims that Fisher's permit log, to which Gearin only recently obtained access in discovery, proves that Fisher in fact approved the issuance of a COO in October 2008, and that some yet-to-be-identified person must have overruled Fisher. According to Gearin, this unidentified person overruled Fisher in order to force the issue of the COO into litigation — knowing that the City would enjoy a friendly forum, as Fisher was acquainted with those who would rule on the propriety of his decision. This

---

[20]Again, Gearin's complaint is presumably that defendants unsuccessfully *attempted* to interfere with this lawsuit, as the Court could not begin to count the number of motions, objections, arguments, and the like that Gearin has made in this hyper-litigated action.

[21]Gearin also claims that, after the mediation, Fisher imposed a whole new set of requirements on her and required her to start the COO application process anew. Although Gearin devotes multiple pages of her brief to quoting these supposed new requirements, the portion of the record she cites in support of her quotations does not exist. *See* Docket No. 177 at 10 (citing Second Clark Decl. ¶ 10, which says merely "There is no 10"). Moreover, the Court is at a loss to understand what these supposed new requirements have to do with the claims being litigated in this action.

(anticipated) favorable decision from a (presumed) friendly forum would then bolster the

argument of defendants in this action that Fisher's regulatory decisions were supported by

probable cause (an issue that the Court has just ruled is irrelevant). All of this, according to

Gearin, is a violation of her constitutional right to access the courts.

Whatever the merits of the *Gearin I* access claim, it is beyond the scope of this lawsuit.[22]

Gearin did not plead these allegations in the amended complaint (which was filed in

January 2009, and thus could have included the allegations about the October 2008 mediation

session). Nor has Gearin filed a motion to amend her complaint. Instead, Gearin appears to

believe that her amended complaint is simply an empty vessel into which she can pour every

grievance that arises between her and defendants. Gearin is incorrect. The Court declines to

permit Gearin to avoid the strictures of Rule 15 and delay the orderly progression of this case by

padding her briefing with brand-new allegations. Because the *Gearin I* access claim is not

properly before the Court — and because the Court, at this late date, will not permit Gearin to

amend her complaint to add this or any other new claim — it is not necessary for the Court to

address the claim.

---

[22]The Court recognizes that the Eighth Circuit has found that an access claim may be
grounded, at least in some circumstances, on a governmental defendant's conduct during
litigation. *See Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1428 (8th Cir.
1986) (holding that the plaintiffs stated a claim for relief where they alleged that the defendant
filed a frivolous counterclaim for condemnation of the plaintiffs' property in order to coerce a
settlement of the plaintiffs' claims). Surely, however, the Eighth Circuit intends for these
decisions to be read very narrowly. If they were not, then every garden-variety discovery
dispute in a lawsuit involving a governmental party would be elevated to the level of a
constitutional claim. *See Estate of Smith v. Marasco*, 318 F.3d 497, 511 (3d Cir. 2003) ("a
plaintiff typically cannot recover for any cover-ups or discovery abuses after an action has been
filed inasmuch as the trial court can deal with such situations in the ongoing action"). The Court
very much doubts that the Eighth Circuit intends its precedents to be read so broadly.

3.  The Toxic-Tort Access Claim

Gearin claims that defendants' adverse regulatory actions were a preemptive strike intended to drain her of money and deter her from filing a toxic-tort lawsuit against the City.  It is settled law that "state officials may not take retaliatory action against an individual designed either to punish him for having exercised his constitutional right to seek judicial relief or to intimidate or chill his exercise of that right in the future."  *Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1428 (8th Cir. 1986); *see also In re Workers' Comp. Refund*, 46 F.3d 813, 822 (8th Cir. 1995) ("This court has recognized that government action designed to keep a citizen from initiating legal remedies sometimes infringes upon the First Amendment right to petition the courts.").

 Although there is, at least in theory, a legal basis for Gearin's toxic-tort access claim, the claim appears to suffer from a fatal defect.  Ordinarily, to prevail on an access claim, a plaintiff must prove the existence of an underlying nonfrivolous legal claim:

> However unsettled the basis of the constitutional right of access to courts, our cases rest on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court.  We indicated as much in our most recent case on denial of access, *Lewis v. Casey, supra*, where we noted that even in forward-looking prisoner class actions to remove roadblocks to future litigation, the named plaintiff must identify a "nonfrivolous," "arguable" underlying claim, *id.*, at 353, and n.3, 116 S. Ct. 2174, and we have been given no reason to treat backward-looking access claims any differently in this respect.  It follows that the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation.

*Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (footnote omitted); *see also Lewis v. Casey*, 518 U.S. 343, 349-53 (1996) (holding that, to state a denial-of-access claim, a prisoner-plaintiff

must show "actual injury" — that is, the obstruction or frustration of a nonfrivolous legal claim); *Sterling v. Wood*, 68 F.3d 1124, 1126-27 (8th Cir. 1995) (rejecting retaliation claim because inmate's underlying claim was frivolous and "there is no constitutional right of access to the courts to prosecute an action that is frivolous or malicious" (citations and quotations omitted)).

Although Gearin darkly hints that the City fears a large toxic-tort lawsuit as a result of the dumping of toxic materials behind her house, Gearin has never identified any actual underlying claim against the City (which, it should again be noted, did not dump the toxic materials). Indeed, after this case was filed, Gearin filed her toxic-tort lawsuit in state court, but did not name the City as a defendant. Second Clark Decl. ¶ 29. It thus appears to the Court that an essential element of Gearin's toxic-tort access claim is lacking.

The Court is not in a position to grant defendants' summary-judgment motion on this basis, however, because defendants have barely addressed the claim and have not argued that it is barred by Gearin's failure to identify a nonfrivolous underlying claim. The Court will not grant summary judgment to defendants on a ground that they did not raise. The Court therefore denies defendants' motion on Gearin's toxic-tort access claim, but without prejudice to defendants' ability to move for summary judgment on that claim at a later time.

### D.  Equal Protection

Gearin brings a "class-of-one" Equal Protection claim under *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam). In *Olech*, the Supreme Court held that, even when a plaintiff does not allege discrimination on the basis of a particular characteristic such as race or sex, a plaintiff may successfully bring a claim under the Equal Protection Clause by alleging that she has been intentionally treated differently from others similarly situated for arbitrary and

wholly irrational reasons. *Id.* at 564-65. Defendants move for summary judgment on this claim, arguing that (1) their treatment of Gearin was not irrational and (2) Gearin has failed to identify any similarly situated comparator.

The Court agrees with defendants that their treatment of Gearin was not irrational, but that is not the relevant question. Instead, the relevant question is whether there is a rational reason for any *difference* between the way defendants treated Gearin and the way defendants treated similarly situated comparators. *See Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602 (2008) ("When those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference . . . ."). To answer that question, it is first necessary to determine whether Gearin has identified any similarly situated comparators.

Gearin has filed a Rule 56(f) affidavit averring that she needs more time to conduct depositions of nearby business owners in order to determine whether any of them are similarly situated. While the Court doubts that Gearin's claim will survive another dispositive motion on this issue, the Court believes that it is preferable to permit Gearin to complete discovery before making a final determination about the existence of similarly situated comparators.[23] This is particularly so because, as discussed above, the existence of similarly situated comparators is also relevant to Gearin's First Amendment retaliation claim, insofar as that claim is grounded on

---

[23]The Court also doubts that Gearin's "class-of-one" claim is cognizable in light of *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008) and *Flowers v. City of Minneapolis*, 558 F.3d 794 (8th Cir. 2009). But defendants raised this issue for the first time in their reply brief and thus Gearin has not had a chance to address it. *See Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd.*, 491 F. Supp. 2d 871, 878 (D. Minn. 2007) (courts generally do not consider arguments made for the first time in a reply brief).

regulatory actions (as opposed to criminal prosecutions). *See Osborne*, 477 F.3d at 1006. The

Court will therefore deny summary judgment on Gearin's Equal Protection claim at this time.

### E. Procedural Due Process

Gearin contends that her due-process rights were violated by the stop-work orders and

the issuance of the retail (M) COO because Fisher and the City (1) failed to notify her of her

right to appeal to the State Board of Appeals and (2) failed to provide her a hearing within

ten days, both of which (Gearin alleges) were in violation of Minn. Stat. § 326B.082. This claim

is frivolous for a number of reasons:

*First*, as discussed earlier, § 326B.082 does not apply to Fisher's actions as the City's

building official.

*Second*, even if § 326B.082 applied, and even if Fisher violated its procedural

requirements, a violation of purely procedural state requirements does not give rise to a federal

due-process claim. *Swipies v. Kofka*, 419 F.3d 709, 717 (8th Cir. 2005) ("Because the Iowa

Code and the due process clause are not coterminous, Deputy Kofka did not violate the due

process clause (and by extension, § 1983) simply by neglecting to follow the Iowa Code word

for word, and the jury should not have been instructed otherwise."); *Williams v. Nix*, 1 F.3d 712,

717-18 (8th Cir. 1993) ("these [state prison] regulations are no more than simple procedural

guidelines or straightforward commands" whose violation does not give rise to a federal due-

process claim). Gearin's attorney seems to believe that every violation of a state law or a

municipal ordinance is necessarily a violation of the federal constitution. That is emphatically

not the law.

*Third*, the record demonstrates that Fisher did, in fact, notify Gearin of her right to appeal to the State Board of Appeals. Docket No. 178-8 at 76 (December 2008 letter from Fisher to Gearin's counsel inviting her to fill out a request for review by the Board of Appeals).

*Finally*, as also discussed earlier, Gearin had ample opportunity to challenge Fisher's decisions, and took full advantage of that opportunity. She has received all of the process that she is due. The Court therefore grants defendants' motion on Gearin's procedural-due-process claim.

### F. Substantive Due Process

"To establish a violation of substantive due process rights by an executive official, a plaintiff must show (1) that the official violated one or more fundamental constitutional rights, and (2) that the conduct of the executive official was shocking to the contemporary conscience." *Flowers v. City of Minneapolis*, 478 F.3d 869, 873 (8th Cir. 2007) (citations and quotations omitted).

Gearin contends that the stop-work orders and the "arbitrary" assignment of the retail (M) classification deprived her of the right to conduct her business. *See* Docket No. 177 at 42, 44. Even assuming that Gearin can show that Fisher's actions violated a fundamental constitutional right (which is doubtful), Fisher's actions in posting the stop-work orders and issuing the retail (M) COO were run-of-the-mill regulatory actions that were not even arbitrary, much less egregious and shocking. "'[T]he theory of substantive due process is properly reserved for truly egregious and extraordinary cases.'" *Gallagher v. Magner*, 619 F.3d 823, 840 (8th Cir. 2010) (quoting *Myers v. Scott County*, 868 F.2d 1017, 1018 (8th Cir. 1989)). This is not such a case, and thus Gearin's substantive-due-process claim will be dismissed. *See id.*

(rejecting substantive-due-process claim in case alleging over-aggressive and sometimes baseless enforcement of the housing code because "[i]n light of the uncontested legitimate goals of enforcing the Housing Code, there is insufficient evidence to reasonably conclude that this is a 'truly egregious and extraordinary' example of government regulation" (quoting *Myers*, 868 F.2d at 1018)).

## G. Fourth Amendment

Gearin originally brought a Fourth Amendment claim seeking to enjoin the City from prospectively applying Maplewood Ordinance 1.13. *See* Docket No. 53 ¶ 33(d). Gearin has now withdrawn that claim, *see* Docket No. 177 at 50, and the Court will therefore dismiss the claim with prejudice.

Gearin's amended complaint also refers to a Fourth Amendment excessive-force claim and requests that, "[t]o the extent the state criminal proceeding no longer bars that claim is [sic] can be read into this Complaint." Docket No. 53 ¶ 33(d). It is not clear whether Gearin has ever been "bar[red]" from bringing her excessive-force claim because of the pendency of the state criminal proceeding. In any event, though, the state criminal proceeding has been dismissed, and thus one could plausibly argue that Gearin has asserted an excessive-force claim in this case. But defendants did not move for summary judgment on an excessive-force claim, and defendants have never contended that the Fourth Amendment claim asserted by Gearin in this case included an allegation of excessive force.

As noted earlier, Gearin has recently filed a second lawsuit arising out of her disputes with the City (*Gearin II*). In that lawsuit, Gearin asserts an excessive-force claim and various other constitutional and state-law claims. The defendants in *Gearin II* (which include both the

-43-

City and Fisher) have moved for partial judgment on the pleadings, but have expressly excluded Gearin's excessive-force claim from their motion and have not objected to her assertion of it in *Gearin II*. The Court therefore concludes that Gearin has not asserted an excessive-force claim in this case and has instead asserted such a claim in *Gearin II*. Thus, the Court's dismissal of Gearin's Fourth Amendment claim in this case will not affect her excessive-force claim in *Gearin II*.

The Court also notes that defendants object to what they characterize as Gearin's attempt to avoid summary judgment by voluntarily dismissing a claim and re-filing it in a new action. As best as the Court can tell, this argument is grounded in defendants' belief that Gearin has in this lawsuit raised the issue of whether the February 15 search of the Building was supported by probable cause. It is clear, though, that Gearin is not litigating an unlawful-search claim in this action. Gearin's amended complaint can be read to assert only two Fourth Amendment claims: a claim concerning Ordinance 1.13 (which the Court is dismissing with prejudice) and a claim of excessive force (which, as discussed above, Gearin has asserted in *Gearin II* without any objection from defendants). And at the hearing on defendants' summary-judgment motion, Gearin made clear that she was not pursuing any claim that the February 15 search was in retaliation for her exercise of First Amendment rights. Tr. 185. Instead, Gearin explained, she will argue in *Gearin II* that the February 15 search violated her Fourth Amendment rights. Tr. 182-83.

The bottom line is that, in this action, neither Gearin nor defendants have asked this Court to rule on the question of whether the February 15 search was supported by probable cause, and none of the claims remaining in this action will require the Court to address that issue.

The Court therefore rejects defendants' assertion that Gearin has improperly attempted to avoid summary judgment on this issue.

### H. Qualified Immunity

Defendants argue that Fisher is entitled to qualified immunity on all of Gearin's claims. A government official is entitled to qualified immunity from liability for civil damages unless his conduct violates clearly established statutory or constitutional rights of which a reasonable official would have known. *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). Determining whether a government official is entitled to qualified immunity involves a two-step process: (1) determining whether the facts alleged or shown make out a violation of a statutory or constitutional right and (2) determining whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Id.* at 815-16. Courts have discretion to decide which of the two steps to address first. *Id.* at 818.

The Court has granted defendants' motion for summary judgment on Gearin's claims of procedural due process, substantive due process, and First Amendment "appeal access." With respect to Gearin's remaining claims — that is, the claims of First Amendment retaliation, First Amendment toxic-tort access, and equal protection — the Court has no idea whether Gearin will be able to show facts necessary to overcome Fisher's claim of qualified immunity. The record is full of gaps and ambiguities, and discovery is not yet completed. But to the extent that Fisher argues that the rights Gearin seeks to vindicate were not clearly established during the relevant time, the Court disagrees. *See Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007) ("A citizen's right to exercise the constitutional freedoms to speak and to seek judicial relief without facing retaliation from government officials is clearly established."); *Osborne*, 477 F.3d at 1006

(recognizing that a plaintiff may seek relief from valid adverse regulatory action on the ground that it was unconstitutional retaliation for First Amendment-protected speech); *Harrison*, 780 F.2d at 1428 ("state officials may not take retaliatory action against an individual designed either to punish him for having exercised his constitutional right to seek judicial relief or to intimidate or chill his exercise of that right in the future"); *Olech*, 528 U.S. at 564 ("Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.").  Fisher's motion for summary judgment on qualified-immunity grounds is therefore denied.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.  Defendants' motion for summary judgment [Docket No. 161] is GRANTED IN PART and DENIED IN PART.

2.  Defendants' motion is GRANTED with respect to the following claims, and they are DISMISSED WITH PREJUDICE AND ON THE MERITS:

    a.  Plaintiffs' claim that defendants violated her First and Fourteenth Amendment right of access to the courts by failing to provide her with a formal notice or order from which she could appeal, by failing to notify her of her right to appeal, and by failing to provide her with a hearing within ten days after posting the stop-work orders;

    b.  Plaintiffs' procedural-due-process claim;

c.       Plaintiffs' substantive-due-process claim; and

d.       Plaintiffs' Fourth Amendment claim.

3.       Defendants' motion is DENIED in all other respects.

Dated: January 28, 2011            s/Patrick J. Schiltz

                                      Patrick J. Schiltz
                                      United States District Judge